# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------------------x

STEVEN FISCHKOFF,

               Plaintiff,

    – against –

LION BIOTECHNOLOGIES, INC. and MARIA
FARDIS,

               Defendants.

-------------------------------------------------------------x

Index No.

**SUMMONS**

Plaintiff designates New York
County as the place for trial

**TO THE ABOVE-NAMED DEFENDANTS:**

    You are hereby summoned to answer the complaint in this action and to serve a copy of

your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the plaintiff's attorneys within twenty (20) days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if this summons is

not personally delivered to you); and in case of your failure to appear or answer, judgment will be

taken against you by default for the relief demanded in the complaint.

    The basis of venue is 503(c).

Dated: June 13, 2017
      New York, New York

                     **MOSES & SINGER LLP**
                     *Attorneys for Plaintiff*

         By:_____

             Kimberly Klein
             Daniel A. Hoffman
             The Chrysler Building
             405 Lexington Avenue
             New York, New York  10174-1299
             212-554-7800 (telephone)
             212-554-7700 (facsimile)

TO:   Lion Biotechnologies, Inc. and Maria Fardis
112 West 34th Street, 17th Floor,
New York, New York 10120
c/o MORGAN, LEWIS & BOCKIUS LLP
Kathryn T. McGuigan
300 South Grand Avenue, 22nd Floor
Los Angeles, California 90071

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------x

STEVEN FISCHKOFF,

                 Plaintiff,

    – against –

LION BIOTECHNOLOGIES, INC. and MARIA
FARDIS,

               Defendants.

---------------------------------------------------------------x

Index No.

**COMPLAINT**

**Jury Trial Demanded**

      Plaintiff, Steven Fischkoff, M.D., by his attorneys Moses & Singer LLP, alleges

as follows:

**The Parties**

      1.    Plaintiff, Dr. Steven Fischkoff ("Dr. Fischkoff" or "Plaintiff"), is an

individual residing at 5 Canoe Brook Road, Short Hills, New Jersey 07078.

      2.    Defendant, Lion Biotechnologies, Inc., ("LBI" or the "Company") is a

Nevada corporation with offices located at 112 West 34th Street, 17th floor, New York,

New York 10120.

      3.    LBI is a publicly traded company listed on NASDAQ that, upon

information and belief, purports to develop cancer immunotherapies.

      4.    Maria Fardis, PhD, is President and CEO of LBI ("Dr. Fardis" and

collectively with LBI, the "Defendants").

**The Employment Agreement and Retention Bonus**

      5.    Dr. Fischkoff commenced his employment with LBI on or about February

4, 2016, as the Company's Vice President-Chief Medical Officer.

6.      Dr. Fischkoff received his medical degree from University of Pennsylvania School of Medicine in 1976 and practiced internal medicine and medical oncology at NYU / Bellevue Medical Center and NCI / Baltimore Cancer Research Center, respectively.  Dr. Fischkoff has conducted clinical research in the pharmaceutical industry for twenty-five (25) years.  Among his many accomplishments, Dr. Fischkoff has been responsible for leading the successful clinical development of the largest selling drug in the world, Humira, and has designed the clinical trial that led to the approval of the first immune-oncology monoclonal antibody (ipilimumab).  Plaintiff also has conducted clinical research in cellular therapy for the past seven (7) years and has interacted directly on numerous occasions with the Federal Drug Administration and overseas health authority.

7.      As a result of his prior experience and background, LBI entered into an Executive Employment Agreement, dated January 22, 2016, with Dr. Fischkoff (the "Employment Agreement"), whereby Plaintiff would, *inter alia*, conduct significant clinical trials for LBI. *See* the Employment Agreement, attached hereto as Exhibit A.

8.      Paragraph 4 of the Employment Agreement sets forth Dr. Fischkoff's compensation.  Among other thing, Dr. Fischkoff was paid an annual base salary of $400,000 and was eligible to participate in the Company's annual incentive compensation program, under which he could receive up to 35 percent of his base salary (the "Incentive Plan").  Payment under the Incentive Plan was not discretionary but based on Dr. Fischkoff satisfying certain individual and Company objectives, which were established in writing by the Company.

9.     Dr. Fischkoff also received stock options to purchase 225,000 shares of the Company's common stock pursuant to a three year vesting schedule.

10.     The Employment Agreement provided Dr. Fischkoff with certain protections as well, including setting forth what he would receive upon separation from the Company.  Paragraph 6.2 of the Employment Agreement provided that if Dr. Fischkoff was terminated without *Cause*, he would receive: (i) his Base Salary through the date of termination; (ii) the prorated portion of the Incentive Compensation; (iii) all unvested stock options, which become fully vested upon termination; (iv) and an additional six months of his Base Salary, totaling $200,000.

11.     Should Dr. Fischkoff be fired for *Cause*, he would only be entitled to his accrued or vested compensation and/or equity.  Section 6.1 of the Employment Agreement provided a narrow definition of *Cause*.  In addition to death, disability, theft and conviction, Dr. Fischkoff could only be dismissed for *Cause* as a result of: (i) a material breach of the Employment Agreement; and (ii) improper use of confidential information.  In addition, the Company is required to to provide Dr. Fischkoff with written notice of any such purported breach identifying the conduct constituting the grounds for termination with sufficien specificity and time to cure.

12.     Critically, the definition of *Cause* does not include poor performance.

13.     Should a party have to sue to enforce the Employment Agreement, the prevailing party is entitled to recover its reasonable attorneys' fees and costs in accordance with Section 8.3.

14.     Roughly four months after Dr. Fischkoff commenced employment, in or about June 2016, the Company underwent significant changes to its leadership and

organization. Among the changes, the Company replaced its CEO with Dr. Fardis and appointed three new directors to the Board of Directors.

15.    Despite the turbulent climate, the Company made considerable overtures to Dr. Fischkoff to ensure he would stay with LBI.

16.    In a letter, dated June 1, 2016, the Company explained some of the changes, including that the Company would be relocating a portion of its business functions/operations to California (the "June 2016 Letter"). Notably Dr. Fardis lives in Califonia and works out of the Company's office in San Francisco, which has roughly 40 employees. Conversely, the New York office currently employs roughly three employees. The Florida location has roughly 20 employees.

17.    The Company, in the June 2016 Letter, affirmed Dr. Fischkoff's importance to its "current business plan" and offered him a substantial retention bonus totaling $200,000 to "induce [him] to remain employed with Lion and to alleviate any concerns about [his] job security…"

18.    The June 2016 Letter explicitly stated that as long as Dr. Fischkoff remained employed with the Company and was not terminated for *Cause*, he would receive $100,000 on December 31, 2016, and $100,000 on June 30, 2017 (the "Retention Bonus"). On or about December 31, 2016, Dr. Fischkoff was paid the first $100,000.

19.    The June 1 Letter made clear that "[t]his letter agreement does not…affect…any employment related agreement that you may have entered into with Lion."

**The Termination**

20.     Since becoming CEO, Dr. Fardis has made clear to Dr. Fischkoff on more than one occasion that the Company will not pay him the compensation and equity outlined in the Employment Agreement upon termination.

21.     Moreover, the Company's New York office lease expires on or about June 30, 2017, and, upon information and belief, the Company wishes to close the New York office and focus on its San Francisco location out of which Dr. Fardis works, a goal which is aided by Dr. Fischkoff's termination.

22.     To this end, Dr. Fardis embarked on a crusade to disparage (if not defame) Dr. Fischkoff with the obvious goal of terminating Dr. Fischkoff and avoid making any payment in accordance with the Employment Agreement.

23.     On or about January 26, 2017, Christine Huh, Senior Vice President of Human Resources, sent Dr. Fischkoff a letter informing him that he was in "material" breach of Section 6.1 of the Employment Agreement (the "Notice Letter"). According to the Notice Letter, the alleged breach involved Dr. Fischkoff's:

> [F]ailure "to perform faithfully and diligently such duties as are reasonable and customary for Executive's position, as well as such other duties as the Chief Executive Officer shall reasonably assign from time to time," as required by Section 2.1 of the Agreement.

24.     The Notice Letter refers Dr. Fischkoff to an accompanying 2016 Employment Performance Review outlining Dr. Fischkoff's alleged performance deficiencies (the "2016 Performance Review").

25.     That same day, Dr. Fardis provided Dr. Fischkoff with a memorandum, dated January 26, 2017, titled "Performance Improvement Plan (PIP)", informing Dr. Fischkoff that he had 30 days to improve or the Company could terminate him (the "PIP Memo"). Despite Dr. Fardis' lack of credentials, including the fact that she is not

medically trained, the PIP Memo and accompanying documentation outlined Dr.

Fischkoff's purported performance deficiencies and provided that Dr. Fardis would

review his compliance with the PIP terms.

26.    Upon being presented with the PIP, Dr. Fischkoff was assured that Dr.

Fardis would be meeting with him periodically to review his progress.  Indeed, the PIP

provided for "Periodic Review Meeting Notes," which were to reflect the meetings with

Dr. Fischkoff.  At no point did Dr. Fardis or anyone meet with Dr. Fischkoff to review

his performance or to help him meet the PIP goals.

27.    In response to the 2016 Performance Review and PIP, Dr. Fischkoff wrote

a detailed rebuttal (the "Rebuttal").  The Rebuttal made clear that not only were the

claims in the 2016 Performance Review and PIP false, but many were flatly contradicted

by the documentary evidence, including Dr. Fardis' outrageous and false allegations that

Dr. Fischkoff does not review protocols; did not follow up with a patient who

experienced CRS; was not identifying sites; was not contacting sites to encourage

enrollment; and provided false statements to IRB questions.

28.    Dr. Fardis' easily refutable fabrications concerning Dr. Fischkoff's

performance and his faithful execution of his duties underscores that the criticisms in the

2016 Performance Review and PIP are pretextual and created solely to support Dr.

Fardis' (and the Company's) attempt to improperly terminate Dr. Fischkoff for *Cause*

solely to avoid paying him the money to which he is contractually entitled.

29.    In a letter, dated February 21, 2017, Moses & Singer LLP, counsel for Dr.

Fischkoff, reminded Ms. Huh that while LBI could terminate Dr. Fischkoff if it was

unhappy with his performance, the Company was required to pay him in accordance with the Employment Agreement and New York law.

30.    The very next day – prior to the expiration of the 30 day PIP period – Dr. Fardis informed Dr. Fischkoff that he failed the PIP.

31.    In a memorandum, dated February 22, 2017, Dr. Fardis informed Dr. Fischkoff that he was not making "all improvements required" and extended the PIP period to March 24, 2017 (the "PIP Extension Memo").

32.    The PIP Extension Memo failed to provide any detail whatsoever regarding Dr. Fischkoff's purported shortcomings, and, as noted, Dr. Fardis did not even wait for the initial 30-day period to lapse before renewing the PIP.  In addition, Dr. Fardis never met with or talked to Dr. Fischkoff about his performance and the PIP goals during the PIP period to assist him in meeting the PIP goals as promised.

33.    On March 28, 2017, the Company terminated Dr. Fischkoff and failed to pay him any of the monies owed pursuant to the Employment Agreement other than accrued compensation.

34.    In addition, Dr. Fischkoff was not paid the second portion of the retention bonus, totaling $100,000.00, owed to him in accordance with the June 1 Letter, which became due and owing upon his termination.

35.    Subsequently, the Company sent a separation agreement, requiring Dr. Fischkoff to release the Company from all claims in exchange for significantly less than what he was entitled to under the Employment Agreement.

**FIRST CLAIM**
**(Breach of Contract against the Company)**

36.     Plaintiff repeats and realleges the allegations in paragraph 1 through 35 hereof as if fully set forth herein.

37.     The parties hereto entered into a valid and enforceable Employment Agreement, under which Plaintiff fully performed.

38.     Notwithstanding Plaintiff's performance, the Company has failed to perform its obligations under the Employment Agreement and has not paid Plaintiff the compensation and equity owed as set forth in the Employment Agreement as a result of his termination.

39.     Already Dr. Fischkoff has suffered substantial damages.  Since Dr. Fischkoff's termination, a class action has been commenced against LBI for, *inter alia*, misrepresentations made to investors causing the Company's stock to decline, thus significantly impacting the value of Dr. Fischkoff's options.

### SECOND CLAIM
#### (New York Labor Law as Against Defendants)

40.     Plaintiff repeats and realleges the allegations in paragraph 1 through 39 hereof as if fully set forth herein.

41.     Pursuant to the New York State Labor Law ("NYLL"), Defendants were plaintiff's "employer" and Plaintiff was an "employee," as defined in Article 6, Section 190 et al.

42.     Pursuant to Article 6, Section 190(1) of the NYLL, wages is defined to include all earnings.

43.     Despite multiple demands, Defendants knowingly and willfully withheld Plaintiff's earned wages upon his termination when Defendants failed to pay Plaintiff his earned compensation, including without limitation, the remaining Retention Bonus and

Incentive Bonus (collectively, "Unpaid Wages") in violation of Article 6 of the NYLL, including, without limitation, an unlawful deduction in violation of NYLL § 193.

44.    Pursuant to Article 6, Section 198(1-a) of the NYLL, Plaintiff is entitled to payment of the Unpaid Wages, reasonable attorney's fees, prejudgment interest, costs of the suit and liquidated damages equal to one hundred percent of the total amount of the wages due.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

i.    On the First Cause of Action in an amount to be determined in accordance with the Employment Agreement, together with prejudgment interest, costs, expenses and attorneys' fees;

ii.    On the Second Cause of Action for Unpaid Wages, reasonable attorney's fees, prejudgment interest, costs of the suit and liquidated damages equal to one hundred percent of the total amount of the wages due;

iii.    For the costs and disbursements of this action on all causes of action; and

iv.    Such other and further relief as this Court deems just and proper.

Dated:  June 13, 2017
New York, New York

Respectfully submitted,

MOSES & SINGER LLP
*Attorneys for Plaintiff*

Kimberly Klein
Daniel A. Hoffman
The Chrysler Building
405 Lexington Avenue
New York, New York  10174-1299
212-554-7800 (telephone)
212-554-7700 (facsimile)

**EXHIBIT A**

## EXECUTIVE EMPLOYMENT AGREEMENT

THIS EXECUTIVE EMPLOYMENT AGREEMENT (the "**Agreement**") dated January 22, 2016 by and between Lion Biotechnologies, Inc., a Nevada corporation (the "**Company**"), and Dr. Steven Fischkoff ("**Executive**") (either party individually, a "**Party**"; collectively, the "**Parties**").

WHEREAS, the Company desires to retain the services of Executive to serve as the Company's Vice President – Chief Medical Officer.

WHEREAS, the Parties desire to enter into this Agreement to set forth the terms and conditions of Executive's employment by the Company and to address certain matters related to Executive's employment with the Company;

WHEREAS, both the Company and the Executive have read and understood the terms and provisions set forth in this Agreement, and Executive acknowledges Executive has been afforded a reasonable opportunity to review this Agreement with Executive's legal counsel to the extent desired;

NOW, THEREFORE, in consideration of the foregoing and the mutual provisions contained herein, and for other good and valuable consideration, the Parties hereto agree as follows:

1.     <u>Employment.</u> Effective February 8, 2016 (the "**Effective Date**"), the Company hereby employs Executive, and Executive hereby accepts such employment, upon the terms and conditions set forth herein.

2.     <u>Duties.</u>

    2.1     <u>Position.</u> Executive shall be employed by the Company in the position of Vice President-Chief Medical Officer. Executive shall have the duties and responsibilities consistent with the position of Vice President-Chief Medical Officer and such other duties and responsibilities assigned by the Company's Chief Executive Officer. Executive shall perform faithfully and diligently such duties as are reasonable and customary for Executive's position, as well as such other duties as the Chief Executive Officer shall reasonably assign from time to time. Executive shall provide his services hereunder from the Company's offices in New York, New York, or from his home, as the Chief Executive Officer may hereafter direct or approve.

    2.2     <u>Best Efforts/Full-Time.</u>

    2.2(a)     Executive understands and agrees that Executive will faithfully devote Executive's best efforts and substantially all of his time during normal business hours to advance the interests of the Company. Executive will abide by all policies duly adopted by the Company, as well as all applicable federal, state and local laws, regulations or ordinances. Executive will act in a manner that Executive reasonably believes to be in the best interest of the Company at all times. Executive further understands and agrees that Executive has a fiduciary duty of loyalty to the Company to the extent provided by applicable law and that Executive will

take no action which materially harms the business, business interests, or reputation of the Company.

2.2(b) Executive agrees that Executive will not directly engage in competition with the Company at any time during the existence of the employment relationship between the Company and Executive.

2.2(c) Executive agrees that, during the term of this Agreement, Executive shall work exclusively for the Company. Consequently, Executive agrees to not accept employment, of any kind, from any person or entity other than the Company, and to not perform duties or render services to any person or entity other than the Company.

3.    At-Will Employment.  Executive's employment with the Company will be "at-will" and will not be for any specific period of time. As a result, Executive is free to resign at any time, for any or no reason, as Executive deems appropriate. The Company will have a similar right and may terminate Executive's employment at any time, with or without cause. Executive's and the Company's respective rights and obligations at the time of termination are outlined below in Section 6 of this Agreement.

4.    Compensation.

4.1    Base Salary.  As compensation for the performance of all duties to be performed by Executive hereunder, the Company shall pay to Executive a base salary of $400,000 per year, less required deductions for state and federal withholding tax, social security and all other employment taxes and authorized payroll deductions, payable on a prorated basis as it is earned, in accordance with the normal payroll practices of the Company (the "**Base Salary**").

4.2    Stock Options.  As of the Effective Date, Executive shall receive stock options to purchase an aggregate of 225,000 shares of the Company's common stock. To the extent legally permitted, the stock options shall be incentive stock options. The stock options will have an exercise price equal to the fair market value of the common stock on the Effective Date. Provided that Executive is still employed with the Company on the following dates, the foregoing stock options will vest in three installments as follows: (i) Options for the purchase of
75,000 shares shall vest on one year anniversary of the Effective Date; and (ii) the remaining stock options shall vest as to 18,750 shares at the end of each quarter over the next two years, commencing with the first quarter following the first anniversary of the Effective Date. Upon the termination of your employment with the Company, except as provided herein, the unvested options will be forfeited and returned to the Company. In addition to the foregoing grant of options, Executive shall also be entitled to receive stock option grants under the Company's stock option plan commencing one year after the Effective Date in such amounts and upon such terms as shall be determined by the Board of Directors, in its sole discretion.

4.3    Incentive Compensation. Executive will be eligible to participate in the Company's annual incentive compensation program ("**Incentive Plan**") applicable to executive employees, as approved by the Board (the year in which the program is implemented, the "**Plan Year**"). The target potential amount payable to Executive under the Incentive Plan, if earned, shall be 35% of Executive's Base Salary earned during the applicable calendar year. Compensation under the Incentive Plan ("**Incentive Compensation**") will be conditioned on the satisfaction of individual and Company objectives, as established in writing by the Company, and the condition that Executive is employed by Company on the Incentive Compensation

payment date, which shall be on or before March 15th of the year following the Plan Year. The payment of any Incentive Compensation pursuant to this Section 4.3 shall be made in accordance with the normal payroll practices of the Company, less required deductions for state and federal withholding tax, social security and all other employment taxes and authorized payroll deductions.

        4.4     <u>Performance Review.</u>  The Company will periodically review Executive's performance on no less than an annual basis and may increase (but not decrease) Executive's salary or other compensation, as it deems appropriate in its sole and absolute discretion.

        4.5     <u>Customary Fringe Benefits.</u>  Executive understands and agrees that certain employee benefits may be provided to the Executive by the Company incident to the Executive's employment. Executive will be eligible for all customary and usual fringe benefits generally available to executive employees and all other employees of the Company subject to the terms and conditions of the Company's benefit plan documents. Executive understands and agrees that any employee benefits provided to the Executive by the Company incident to the Executive's employment (other than Base Salary, Incentive Compensation and any applicable Severance Payment) are provided solely at the discretion of the Company and may be modified, suspended or revoked at any time, without notice or the consent of the Executive, unless otherwise provided by law. Moreover, to the extent that these benefits are provided pursuant to policies or plan documents adopted by the Company, Executive acknowledges and agrees that these benefits shall be governed by the applicable employment policies or plan documents. The benefits to be provided to Executive shall include group health and dental insurance and participation in a 401-K plan.

        4.6     <u>Vacation Days.</u>  Executive will be eligible to receive 15 vacation days per year. Vacation time is an accrued benefit and will be paid out at termination in accordance with the Company's standard policies. In addition, Executive will be eligible to receive two floating holidays per year.

        4.7     <u>Business Expenses.</u>  Executive will be reimbursed for all reasonable, out-of-pocket business expenses incurred in the performance of Executive's duties on behalf of the Company, including travel-related expenses. To obtain reimbursement, expenses must be submitted promptly with appropriate supporting documentation in accordance with the Company's policies.

        5.     <u>Confidentiality and Proprietary Agreement.</u>  Executive agrees to abide by the Company's Employee Proprietary Information and Inventions Agreement (the "**Non-Disclosure Agreement**"), which Executive has signed and is incorporated herein by reference.

        6.     <u>Termination of Executive's Employment.</u>

        6.1     <u>Termination for Cause by the Company.</u>  The Company may terminate Executive's employment immediately at any time and without notice for "Cause." For purposes of this Agreement, "Cause" shall mean (i) a material breach by Executive of this Agreement or the Non-Disclosure Agreement; (ii) the death of Executive or his disability resulting in his inability to perform his reasonable duties assigned hereunder for a period of 180 days; (iii) Executive's theft, dishonesty, or falsification of any Company documents or records; (iv) Executive's improper use or disclosure of the Company's confidential or proprietary information; or (v) Executive's conviction (including any plea of guilty or nolo contendere) of any criminal act which impairs Executive's ability to perform his duties hereunder or which in the Board's judgment may materially damage the business or reputation of the Company; provided, however, that prior to

3

termination for cause arising under clause (i), Executive shall have a period of ten days after written notice from the Company to cure the event or grounds constituting such cause. Any notice of termination provided by Company to Executive under this Section 6.1 shall identify the events or conduct constituting the grounds for termination with sufficient specificity so as to enable Executive to take steps to cure, if curable, the same if such default is a material breach by Executive of this Agreement of the Non-Disclosure Agreement. In the event Executive's employment is terminated in accordance with this subsection 6.1, Executive shall be entitled to receive only the Base Salary and any earned Incentive Compensation (as defined in Section 4.3 above) then in effect, prorated to the date of termination. All other obligations of the Company to Executive pursuant to this Agreement will be automatically terminated and completely extinguished.

      6.2    Termination Without Cause By The Company/Separation Package. The Company may terminate Executive's employment under this Agreement without Cause (as defined in Section 6.1 above) at any time on thirty (30) days' advance written notice to Executive. In the event of such termination, Executive will receive Executive's Base Salary through the date of termination and a prorated portion of any Incentive Compensation that was earned under Section 4.3 through the date of termination. Upon such termination without Cause, any then unvested stock options granted to Executive by the Company will become fully vested and Executive shall have six months from the date of termination within which to exercise his vested options. In addition, upon a termination of Executive's employment by the Company without Cause, Executive will be eligible to receive a "**Severance Payment**" equivalent to six months of Executive's then Base Salary, payable in full within thirty (30) days after termination, provided that Executive first satisfies the Severance Conditions. For purposes of this Agreement, the "**Severance Conditions**" are defined as (1) Executive's execution and non- revocation of a full general release, in the form attached hereto as Exhibit A, and such release has become effective in accordance with its terms prior to the 30th day following the termination date; and (2) Executive's reaffirmation of Executive's commitment to comply, and actual compliance, with all surviving provisions of this Agreement. Following payment of the Severance Payment, Base Salary, any Incentive Compensation and any benefits required to be paid in accordance with applicable benefit plans through the date of termination, all other obligations of the Company to Executive pursuant to this Agreement will be automatically terminated and completely extinguished.

      6.3    Termination Upon a Change of Control. For purposes of this Agreement, "**Change of Control**" shall mean: (1) a merger or consolidation or the sale or exchange by the stockholders of the Company of capital stock of the Company, where the stockholders of the Company immediately before such transaction do not obtain or retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock or other voting equity of the surviving or acquiring corporation or other surviving or acquiring entity, in substantially the same proportion as before such transaction; (2) any transaction or series of related transactions to which the Company is a party in which in excess of fifty percent (50%) of the Company's voting power is transferred; or (3) the sale or exchange of all or substantially all of the Company's assets (other than a sale or transfer to a subsidiary of the Company as defined in section 424(f) of the Internal Revenue Code of 1986, as amended (the "**Code**")), where the stockholders of the Company immediately before such sale or exchange do not obtain or retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock or other voting equity of the corporation or other entity acquiring the Company's assets, in substantially the same proportion as before such transaction; provided, however, that a Change of Control shall not be deemed to have occurred pursuant to any transaction or series of transactions relating to a public or private financing or re-financing, the principal purpose of which is to raise money for the Company's working capital or capital expenditures and which does not result in a change in a majority of the members of the Board. If, within six (6) months immediately preceding a

Change of Control or within twelve (12) months immediately following a Change of Control, the Executive's employment is terminated by the Company for any reason other than Cause, then the Executive shall be entitled to receive the Severance Payment and stock option vesting and exercisability set forth in Section 6.2, provided that Executive first satisfies the Severance Conditions.    Following payment of the Severance Payment, Base Salary, any Incentive Compensation and any benefits required to be paid in accordance with applicable benefit plans through the date of termination, all other obligations of the Company to Executive pursuant to this Agreement will be automatically terminated and completely extinguished.

    6.4    Resignation.  Executive shall have the right to terminate this Agreement at any time, for any reason, by providing the Company with thirty (30) days written notice, provided, however, that subsequent to Executive's resignation, Executive shall be required to comply with all surviving provisions of this Agreement.  Executive shall not be entitled to any Severance Pay. Executive will only be entitled to receive Executive's Base Salary earned up to the date of termination.  Notwithstanding the foregoing, Executive has the right upon thirty (30) days written notice to the Company to terminate Executive's employment for "Good Reason" due to occurrence of any of the following:  (i) a material adverse change in Executive's title, duties or responsibilities; (ii) any failure by the Company to pay, or any reduction by Company of, the base salary or any failure by Company to pay any Incentive Compensation to which Executive is entitled pursuant to Section 4;  (iii) the Company creates a work environment designed to constructively terminate Executive or to unlawfully harass or retaliate against Executive; or (iv) a Change of Control occurs in which the Company is not the surviving entity and the surviving entity fails to offer Executive an executive position at a compensation level at least equal to Executive's then compensation level under this Agreement.    In the event that Executive terminates his employment for Good Reason, then Executive shall be entitled to receive the Base Salary, any earned Incentive Compensation, Severance Payment and stock option vesting and exercisability as if Executive were terminated by the Company without Cause under Section 6.2, subject to Executive's compliance with all of the Severance Conditions.

    6.5    Application of Section 409A.

        6.5(a) Notwithstanding anything set forth in this Agreement to the contrary, no amount payable pursuant to this Agreement which constitutes a "deferral of compensation" within the meaning of the Treasury Regulations issued pursuant to Section 409A of the Code (the "**Section 409A Regulations**") shall be paid unless and until Executive has incurred a "separation from service" within the meaning of the Section 409A Regulations.

        6.5(b) Company intends that income provided to Executive pursuant to this Agreement will not be subject to taxation under Section 409A of the Code.  The provisions of this Agreement shall be interpreted and construed in favor of satisfying any applicable requirements of Section 409A of the Code.  **However, Company does not guarantee any particular tax effect for income provided to Executive pursuant to this Agreement.**  In any event, except for Company's responsibility to withhold applicable income and employment taxes from compensation paid or provided to Executive, Company shall not be responsible for the payment of any applicable taxes on compensation paid or provided to Executive pursuant to this Agreement.

        6.5(c) Furthermore, to the extent that Executive is a "specified employee" within the meaning of the Section 409A Regulations as of the date of Executive's separation from service, no amount that constitutes a deferral of compensation which is payable on account of Executive's separation from service shall be paid to Executive before the date (the "**Delayed Payment Date**") which is first day of the seventh month after the date of Executive's separation

4831689 1                                            5

from service or, if earlier, the date of Executive's death following such separation from service. All such amounts that would, but for this Section, become payable prior to the Delayed Payment Date will be accumulated and paid on the Delayed Payment Date.

6.5(d) Notwithstanding anything herein to the contrary, the reimbursement of expenses or in-kind benefits provided pursuant to this Agreement shall be subject to the following conditions: (i) the expenses eligible for reimbursement or in-kind benefits in one taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits in any other taxable year; (ii) the reimbursement of eligible expenses or in-kind benefits shall be made promptly, subject to Company's applicable policies, but in no event later than the end of the year after the year in which such expense was incurred; and (iii) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit.

6.5(e) For purposes of Section 409A of the Code, the right to a series of installment payments under this Agreement shall be treated as a right to a series of separate payments.

7.    Post-Employment Covenants.
7.1    Non-Competition.  In consideration of the various covenants and obligations of the Company pursuant to this Agreement, for a period of [12 months] following the termination of the Executive's employment (the "Restrictive Period"), Executive shall not (either directly or indirectly as an employee, partner, officer, consultant, shareholder or otherwise of any corporation, governmental body, individual, partnership, limited liability company, trust or other entity) promote, distribute or sell any product or service or engage in any business activity that is the same as, substantially similar to or otherwise competitive with the business conducted by the Company and its subsidiaries as of the termination of Executive's employment, that business being the research and/or commercialization of tumor infiltrating lymphocytes (TIL).  Executive understands and agrees that in view of the Company's worldwide business interests, this limitation similarly applies on a worldwide basis and that such worldwide limitation is reasonable and necessary.

7.2    Non-Solicitation.  Executive agrees that during the Restrictive Period, Executive shall not:

(a)    Solicit or in any manner encourage, either directly or indirectly, any employee or consultant of the Company to leave the Company for any reason; nor will he interfere in any other manner with the employment or business relationships at the time existing between the Company and its current or prospective employees or consultants; or

(b)    Induce or attempt to induce any customer, supplier, distributor, licensee or other business affiliate of the Company to cease doing business with the Company or in any way interfere with the existing business relationship between any customer, supplier, distributor, licensee or other business affiliate and the Company.

7.3    Non-Disparagement.  Executive agrees, at all times following the Effective Date, not to, directly or indirectly, on his behalf or on behalf of any other person or entity, (a) take any action which is intended, or could reasonably be expected, to harm, disparage, defame, slander, or lead to unwanted or unfavorable publicity for the Company, its subsidiaries or any of their respective affiliates, or its or their respective equityholders, directors, officers, members, managers, partners, employees, representatives or agents, or otherwise take any action which could reasonably be expected to detrimentally affect the reputation, image, relationships or public view of any such person or entity or (b) attempt to do any of the foregoing, or assist, entice, induce or encourage any other person or entity to do or attempt to do any activity which, were it done by Executive, would violate any provision of this Section 7.3; provided, however, that Executive shall

4831689_1                                        6

not be prohibited by this Section 7.3 from (i) making truthful statements when required by order of a court or other body of competent jurisdiction or as required by law or (ii) solely within the context of seeking judicial enforcement of legal or contractual rights against a person or entity.

       7.4    <u>Remedies.</u>  Executive acknowledges that the duration of the Restrictive Period and the geographical area of the imposed restrictions are fair and reasonable and are reasonably required for the protection of the Company's business interests, including its goodwill. The Executive (a) acknowledges that his failure to comply with any requirement of this Section 7 this Agreement will cause the Company irreparable harm and that a remedy at law for such a failure would be an inadequate remedy; and (b) consents to the Company's obtaining from a court having jurisdiction specific performance, an injunction, a restraining order or any other equitable relief in order to enforce any such provision.  The right to obtain such equitable relief shall be in addition to, and not in lieu of, any other remedy to which the Company is entitled under applicable law (including, but not limited to, monetary damages).  If any court of competent jurisdiction shall at any time deem the term of this Agreement or any particular provision set forth in this Section 7 too lengthy or the territory too extensive, the other provisions of this Agreement shall nevertheless stand, the Restrictive Period herein shall be deemed to be the longest period permissible by law under the circumstances and the territory herein shall be deemed to comprise the largest territory permissible by law under the circumstances.  The court in each case shall reduce the time period and/or territory to the permissible duration or size, and the Executive shall be bound by such reformed terms.

       8.    <u>General Provisions.</u>

       8.1    <u>Successors and Assigns.</u>  The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company.  Executive shall not be entitled to assign any of Executive's rights or obligations under this Agreement.

       8.2    <u>Waiver.</u>  Either party's failure to enforce any provision of this Agreement shall not in any way be construed as a waiver of any such provision, or prevent that party thereafter from enforcing each and every other provision of this Agreement.

       8.3    <u>Attorney's Fees.</u>  In the event of any dispute or claim relating to or arising out of Executive's employment relationship with Company, this Agreement, or the termination of Executive's employment with Company for any reason, the prevailing party in any such dispute or claim shall be entitled to recover its reasonable attorney's fees and costs.

       8.4    <u>Severability.</u>  In the event any provision of this Agreement is found to be unenforceable by an arbitrator or court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to allow enforceability of the provision as so limited, it being intended that the parties shall receive the benefit contemplated herein to the fullest extent permitted by law.  If a deemed modification is not satisfactory in the judgment of such arbitrator or court, the unenforceable provision shall be deemed deleted, and the validity and enforceability of the remaining provisions shall not be affected thereby.

       8.5    <u>Interpretation; Construction.</u>  The headings set forth in this Agreement are for convenience only and shall not be used in interpreting this Agreement. Executive has participated in the negotiation of the terms of this Agreement.  Furthermore, Executive acknowledges that Executive has had an opportunity to review and revise the Agreement and have it reviewed by legal counsel, if desired, and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

8.6    <u>Governing Law.</u>  This Agreement will be governed by and construed in accordance with the laws of the United States and the internal laws of the State of New York.

8.7    <u>Notices.</u>  Any notice required or permitted by this Agreement shall be in writing and shall be delivered as follows with notice deemed given as indicated:  (a) by personal delivery when delivered personally; (b) by overnight courier upon written verification of receipt; (c) by telecopy, facsimile transmission, or electronic transmission such as e-mail, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt.  Notice shall be sent to the addresses set forth below each party's signature, or such other address as either party may specify in writing.

8.8    <u>Entire Agreement.</u>  This Agreement constitutes the entire agreement between the Parties relating to this subject matter and supersedes all prior or simultaneous representations, discussions, negotiations, and agreements, whether written or oral.    This Agreement may be amended or modified only with the written consent of Executive and the Company.    No oral waiver, amendment or modification will be effective under any circumstances whatsoever.

*[Execution Page Follows]*

THE PARTIES TO THIS AGREEMENT HAVE READ THE FOREGOING AGREEMENT AND FULLY UNDERSTAND EACH AND EVERY PROVISION CONTAINED HEREIN. WHEREFORE, THE PARTIES HAVE EXECUTED THIS AGREEMENT ON THE DATES SHOWN BELOW.

EXECUTIVE:

_____

**Dr. Steven Fischkoff**

Address: _____

_____

COMPANY:

**Lion Biotechnologies, Inc.**

By: _____

Name:  Elma Hawkins
Title:  President & Chief Executive Officer
112 W. 34th Street 18th Floor
New York, NY 10120

4831689_1

**Exhibit A**
**Form of Release and Waiver of Claims**

In consideration for the severance payments and other benefits provided for in the Executive Employment Agreement, effective as of February 8, 2016 (the "Employment Agreement"), I, Steven Fischkoff, hereby furnish Lion Biotechnologies, Inc., a Nevada corporation (the "Company") with the following release and waiver (the "Release and Waiver").

In exchange for the consideration provided to me by the Employment Agreement, I hereby generally and completely release the Company and its officers, directors, employees, agents, attorneys, predecessors, successors, parent and subsidiary entities, insurers, affiliates, and assigns from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring prior to my signing this Release and Waiver. This general release includes, but is not limited to: (1) all claims arising out of or in any way related to my employment with the Company or the termination of that employment; (2) all claims related to my compensation or benefits from the Company, including, but not limited to, salary, bonuses, commissions, vacation pay, expense reimbursements, severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company; (3) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (4) all tort claims, including, but not limited to, claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (5) all federal, state, and local statutory claims, including, but not limited to, claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990, and the federal Age Discrimination in Employment Act of 1967 (as amended) ("ADEA").

I acknowledge that, among other rights, I am waiving and releasing any rights I may have under ADEA and that this Release and Waiver is knowing and voluntary. I further acknowledge that I have been advised, as required by the Older Workers Benefit Protection Act, that: (a) the release and waiver granted herein does not relate to claims under the ADEA which may arise after this Release and Waiver is executed; (b) I should consult with an attorney prior to executing this Release and Waiver; (c) I have 21 days in which to consider this Release and Waiver (although I may choose voluntarily to execute this Release and Waiver earlier); (d) I have seven days following the execution of this Release and Waiver to revoke my consent to this Release and Waiver; and (e) this Release and Waiver shall not be effective until the eighth day after I execute this Release and Waiver and the revocation period has expired. Notwithstanding the foregoing, nothing contained in this Release and Waiver shall waive, release or otherwise diminish any claims that I might have at law or in equity for payment of severance or other benefits to which I am entitled under the terms of the Employment Agreement.

I acknowledge my continuing obligations under my Employee Proprietary Information and Inventions Agreement between myself and the Company (the "Confidentiality Agreement"). I understand and agree that my right to the severance pay I am receiving is in exchange for my agreement to the terms of this Release and Waiver and is contingent upon my continued compliance with my Confidentiality Agreement.

4831689_1

This Release and Waiver, including the Confidentiality Agreement, and the Employment Agreement constitute the complete, final and exclusive embodiment of the entire agreement between the Company and me with regard to the subject matter hereof.  I am not relying on any promise or representation by the Company that is not expressly stated herein.  This Release and Waiver may only be modified by a writing signed by both me and a duly authorized officer of the Company.

_____
Steven Fischkoff

Dated: _____

4831689_1

# MOSES & SINGER LLP

The Chrysler Building
405 Lexington Avenue
NY, NY 10174-1299

TO:

Morgan, Lewis & Bockius LLP
Attn: Kathryn McGuigan
300 South Grand Ave., 22nd Floor
Los Angeles, CA 90071



U.S. POSTAGE PITNEY BOWES

ZIP 10174
02 4M
0000333665

$ 001.82⁰
JUN 14 2017