**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
STEVEN FISCHKOFF,

                              Plaintiff,

      – against –

IOVANCE BIOTHERAPEUTICS, INC. f/k/a LION
BIOTECHNOLOGIES, INC. and MARIA FARDIS,

                              Defendants.

---------------------------------------------------------------------x

Case No. 17-cv-05041 (AT)

**SECOND AMENDED**
**COMPLAINT**

**Jury Trial Demanded**

      Plaintiff, Steven Fischkoff, M.D., by his attorneys Moses & Singer LLP, alleges as follows:

**The Parties**

      1.     Plaintiff, Dr. Steven Fischkoff ("Dr. Fischkoff" or "Plaintiff"), is an individual residing at 5 Canoe Brook Road, Short Hills, New Jersey 07078.

      2.     Defendant, Iovance Biotherapeutics, Inc. f/k/a Lion Biotechnologies, Inc., ("LBI" or the "Company") is a Nevada corporation with offices located at 112 West 34th Street, 17th floor, New York, New York 10120. The Company formerly changed its corporate name on or about June 27, 2017.

      3.     LBI is a publicly traded company listed on NASDAQ that, upon information and belief, purports to develop cancer immunotherapies.

      4.     Maria Fardis, PhD, is President and CEO of LBI ("Dr. Fardis" and collectively with LBI, the "Defendants").

**The Employment Agreement and Retention Bonus**

1

5. Dr. Fischkoff commenced his employment with LBI on or about February 4, 2016, as the Company's Vice President-Chief Medical Officer.

6. Dr. Fischkoff received his medical degree from the University of Pennsylvania School of Medicine in 1976 and practiced internal medicine and medical oncology at NYU / Bellevue Medical Center and NCI / Baltimore Cancer Research Center, respectively. Dr. Fischkoff has conducted clinical research in the pharmaceutical industry for twenty-five (25) years. Among his many accomplishments, Dr. Fischkoff has been responsible for leading the successful clinical development of the largest selling drug in the world, Humira, and has designed the clinical trial that led to the approval of the first immune-oncology monoclonal antibody (ipilimumab). Plaintiff also has conducted clinical research in cellular therapy for the past seven (7) years and has interacted directly on numerous occasions with the Federal Drug Administration and overseas health authority.

7. As a result of his prior experience and background, LBI entered into an Executive Employment Agreement, dated January 22, 2016, with Dr. Fischkoff (the "Employment Agreement"), whereby Plaintiff would, *inter alia*, conduct significant clinical trials for LBI. *See* the Employment Agreement, attached hereto as Exhibit A.

8. Pursuant to the Employment Agreement, Plaintiff performed such duties and responsibilities consistent with his title and as assigned by the Company's Chief Executive Officer. *See* Exhibit A at ¶2.1: "Executive shall perform faithfully and diligently such duties as are reasonable and customary for Executive's position as well as such other duties as the Chief Executive Officer shall reasonably assign from time to time.

9. In addition, Dr. Fischkoff would work out of the Company's offices in New York, New York, or from his home "as the Chief Executive Officer may hereafter direct or approve." *Id*.

10. Paragraph 4 of the Employment Agreement sets forth Dr. Fischkoff's compensation. Among other thing, Dr. Fischkoff was paid an annual base salary of $400,000 and was eligible to participate in the Company's annual incentive compensation program, under which he could receive up to 35 percent of his base salary (the "Incentive Plan"). Payment under the Incentive Plan was not discretionary but based on Dr. Fischkoff satisfying certain individual and Company objectives, which were established in writing by the Company.

11. Dr. Fischkoff also received stock options to purchase 225,000 shares of the Company's common stock pursuant to a three year vesting schedule.

12. The Employment Agreement provided Dr. Fischkoff with certain protections as well, including setting forth what he would receive upon separation from the Company. Paragraph 6.2 of the Employment Agreement provided that if Dr. Fischkoff was terminated without *Cause*, he would receive: (i) his Base Salary through the date of termination; (ii) the prorated portion of the Incentive Compensation; (iii) all unvested stock options, which become fully vested upon termination; and (iv) an additional six months of his Base Salary, totaling $200,000.

13. Should Dr. Fischkoff be fired for *Cause*, he would only be entitled to his accrued or vested compensation and/or equity. Section 6.1 of the Employment Agreement provided a narrow definition of *Cause*. In addition to death, disability, theft and conviction, Dr. Fischkoff could only be dismissed for *Cause* as a result of: (i) a material breach of the Employment Agreement; and (ii) improper use of confidential information. In addition, the Company is

required to provide Dr. Fischkoff with written notice of any such purported breach identifying the conduct constituting the grounds for termination with sufficient specificity and time to cure.

14. Critically, the definition of *Cause* does not include poor performance.

15. Should a party have to sue to enforce the Employment Agreement, the prevailing party is entitled to recover its reasonable attorneys' fees and costs in accordance with Section 8.3.

16. Roughly four months after Dr. Fischkoff commenced employment, in or about June 2016, the Company underwent significant changes to its leadership and organization. Among these changes, the Company replaced its CEO with Dr. Fardis and appointed three new directors to the Board of Directors.

17. Despite the turbulent climate, the Company made considerable overtures to Dr. Fischkoff to ensure that he would stay with LBI.

18. In a letter dated June 1, 2016, the Company explained some of the changes, including that the Company would be relocating a portion of its business functions/operations to California (the "June 2016 Letter"). Notably, Dr. Fardis lives in California and works out of the Company's office in San Francisco, which has roughly 40 employees. Conversely, the New York office currently employs roughly three employees. The Florida location has roughly 20 employees.

19. The Company, in the June 2016 Letter, affirmed Dr. Fischkoff's importance to its "current business plan" and offered him a substantial retention bonus totaling $200,000 to "induce [him] to remain employed with Lion and to alleviate any concerns about [his] job security…"

20. The June 2016 Letter explicitly stated that as long as Dr. Fischkoff remained employed with the Company and was not terminated for *Cause*, he would receive $100,000 on December 31, 2016, and $100,000 on June 30, 2017 (the "Retention Bonus").  On or about December 31, 2016, Dr. Fischkoff was paid the first $100,000.

21. The June 1 Letter made clear that "[t]his letter agreement does not…affect…any employment related agreement that you may have entered into with Lion."

**The Termination**

22. Since becoming CEO, Dr. Fardis has made clear to Dr. Fischkoff on more than one occasion that the Company will not pay him the compensation and equity outlined in the Employment Agreement upon termination.

23. Moreover, upon information and belief, the Company wishes to close the New York office and focus on its San Francisco location out of which Dr. Fardis works, a goal which is aided by Dr. Fischkoff's termination.

24. To this end, Dr. Fardis embarked on a crusade to disparage (if not defame) Dr. Fischkoff with the obvious goal of terminating Dr. Fischkoff and avoiding making any payment in accordance with the Employment Agreement.

25. On or about January 26, 2017, Christine Huh, Senior Vice President of Human Resources, sent Dr. Fischkoff a letter informing him that he was in "material" breach of Section 6.1 of the Employment Agreement (the "Notice Letter").  According to the Notice Letter, the alleged breach involved Dr. Fischkoff's:

> [F]ailure "to perform faithfully and diligently such duties as are reasonable and customary for Executive's position, as well as such other duties as the Chief Executive Officer shall reasonably assign from time to time," as required by Section 2.1 of the Agreement.

26. The Notice Letter refers Dr. Fischkoff to an accompanying 2016 Employment Performance Review outlining Dr. Fischkoff's alleged performance deficiencies (the "2016 Performance Review").

27. On the same day that Dr. Fischkoff received the Notice Letter, Dr. Fardis provided Dr. Fischkoff with a memorandum, dated January 26, 2017, titled "Performance Improvement Plan (PIP)," informing Dr. Fischkoff that he had 30 days to improve or the Company could terminate him (the "PIP Memo"). Despite Dr. Fardis' lack of credentials, including the fact that she is not medically trained, the PIP Memo and accompanying documentation outlined Dr. Fischkoff's purported performance deficiencies and provided that Dr. Fardis would review his compliance with the PIP terms.

28. Upon being presented with the PIP, Dr. Fischkoff was assured that Dr. Fardis would be meeting with him periodically to review his progress. Indeed, the PIP provided for "Periodic Review Meeting Notes," which were to reflect the meetings between Dr. Fardis and Dr. Fischkoff. At no point did Dr. Fardis or anyone else meet with Dr. Fischkoff to review his performance or to help him meet the PIP goals.

29. In response to the 2016 Performance Review and PIP, Dr. Fischkoff wrote a detailed rebuttal (the "Rebuttal"). The Rebuttal made clear that not only were the claims in the 2016 Performance Review and PIP false, but many were flatly contradicted by the documentary evidence, including Dr. Fardis' outrageous and false allegations that Dr. Fischkoff does not review protocols; did not follow up with a patient who experienced CRS; was not identifying sites; was not contacting sites to encourage enrollment; and provided false statements to IRB questions.

30. Dr. Fardis' easily refutable fabrications concerning Dr. Fischkoff's performance and his faithful execution of his duties underscores that the criticisms in the 2016 Performance Review and PIP are pretextual and created solely to support Dr. Fardis' (and the Company's) attempt to improperly terminate Dr. Fischkoff for *Cause* solely to avoid paying him the money to which he is contractually entitled.

31. In a letter dated February 21, 2017 (the "Febuary 21, 2017 Letter"), Moses & Singer LLP, counsel for Dr. Fischkoff, reminded Ms. Huh that while LBI could terminate Dr. Fischkoff if it was unhappy with his performance, the Company was required to pay him in accordance with the Employment Agreement and New York law.

32. The very next day – prior to the expiration of the 30-day PIP period – Dr. Fardis informed Dr. Fischkoff that he failed the PIP.

33. In a memorandum dated February 22, 2017, Dr. Fardis informed Dr. Fischkoff that he was not making "all improvements required" and extended the PIP period to March 24, 2017 (the "PIP Extension Memo").

34. The PIP Extension Memo failed to provide any detail whatsoever regarding Dr. Fischkoff's purported shortcomings, and, as noted, Dr. Fardis did not even wait for the initial 30-day period to lapse before renewing the PIP. In addition, Dr. Fardis never met with or talked to Dr. Fischkoff about his performance and the PIP goals during the PIP period to assist him in meeting the PIP goals as promised.

35. On March 28, 2017, at Dr. Fardis' direction, the Company terminated Dr. Fischkoff and refused to pay him any of the monies owed pursuant to the Employment Agreement other than accrued compensation.

36. In addition, Dr. Fischkoff was not paid the second portion of the retention bonus, totaling $100,000.00, owed to him in accordance with the June 1 Letter, which became due and owing upon his termination.

37. Subsequently, the Company sent a separation agreement, requiring Dr. Fischkoff to release the Company from all claims in exchange for significantly less than what he was entitled to under the Employment Agreement.

**The Retaliation**

38. Solely in retaliation for Plaintiff filing this Action, the Company alleged five barebones counterclaims, claiming, *inter alia*, that Plaintiff misappropriated trade secrets and violated restrictive covenants not to compete or solicit the Company's employees and consultants (the "Counterclaims").

39. Thus, despite LBI's breach of the underlying Employment Agreement, the Company sought to strictly enforce the restrictive covenants and confidentiality provisions of the very Employment Agreement it had willfully breached by failing to pay Dr. Fischkoff his compensation.

40. A day after filing the Counterclaims, the Company filed an emergency application for a Preliminary Injunction and Temporary Restraining Order, seeking to enjoin Dr. Fischkoff from (1) disclosing or using any of the Company's confidential information; (2) continuing his employment at his new employer; (3) soliciting LBI employees or consultants; and (4) from otherwise interfering with Lion (the "Application").

41. The Company filed the Counterclaims and the Application in bad faith and solely to harass and retaliate against Dr. Fischkoff as evidenced by LBI's failure to allege any facts that

Plaintiff solicited any LBI employee or consultant or that Plaintiff's new employer was a competitor.

42. Indeed, upon information and belief, Dr. Fardis had internal discussions regarding whether Plaintiff's new employer was a competitor and was told the two companies do not compete.

43. Further, as high-level employees of the Company, including the Chief Scientific Officer, provided references to Plaintiff concerning his new position, Defendants were well aware of Plaintiff's new employer prior to filing their Application and the Counterclaims and did not believe Plaintiff was in breach of the non-compete.

44. In addition, upon information and belief, Defendants were well aware that Plaintiff sent Company information to his personal email in order to work from home, as Plaintiff's Employment Agreement provided that he could work from home as well as the New York City office, and the Company never installed remote access software onto his home computer.

45. Despite that the Company had access to Plaintiff's Company computer at all times and could have determined if Plaintiff was improperly accessing the Company's systems at any time, Defendants, upon information and belief, did not do so until after Plaintiff commenced this Action.

46. All of the surrounding circumstances, including the fact that the Application was filed on the day that Lion's answer was due in the underlying lawsuit, underscore that the Counterclaims and Application are groundless, were made in bad faith, and are plainly retaliatory.

47.     The retaliatory filing is particularly penal to Dr. Fischkoff because it requires him to expend significant money and resources to defend against the meritless Counterclaims and Application, and it sidetracks the lawsuit from the underlying claims that he is owed unpaid wages and severance in accordance with his Employment Agreement and Retention Bonus.

48.     The Counterclaims and Application were designed to deter Plaintiff from seeking legal redress and constitute impermissible adverse retaliatory actions.

**The Defamation**

49.     In the February 21, 2017 Letter, counsel for Dr. Fischkoff informed Iovance of their position that any termination of Dr. Fisckoff for purported performance reasons would not constitute a termination "for cause" as that term was defined in the Employment Agreement. Plaintiff's counsel reiterated that position in a second letter dated February 24, 2017.

50.     Despite this, on or about November 2, 2017, Defendants publicly filed with the U.S. Securities and Exchange Commission (the "SEC") a Form 10-Q for the quarterly period ended September 30, 2017 (the "November 2017 Form 10-Q"), in which Defendants stated that "Dr. Fischkoff was terminated 'for cause' as that term is defined in his employment agreement" (the "Defamatory Statement").

51.     Dr. Fardis, as the Company's Chief Executive Officer, certified to the truth of the Defamatory Statement, affirming that the November 2017 Form 10-Q "does not contain any untrue statement of a material fact."

52.     As a named defendant in the instant lawsuit, Dr. Fardis was well aware that Dr. Fischkoff was challenging the Company's stated reason for terminating his employment purportedly "for cause."

53.     Plaintiff notified Defendants of his intent to allege a defamation claim based on the defamatory statement contained in the November 2017 Form 10-Q on December 12, 2017, in his Memorandum of Law in Opposition to Defendants' Motion to Partially Dismiss the Amended Complaint (ECF No. 80 at p. 24).

54.     In utter disregard, on or about March 12, 2018, the Company filed with the SEC a Form 10-K for the fiscal year ended December 31, 2017 (the "March 2018 Form 10-K"), repeating the same Defamatory Statement from the November 2017 Form 10-Q.

55.     Approximately two months later, on May 10, 2018, the Company filed a Form 10-Q for the quarterly period ended March 31, 2018 (the "May 2018 Form 10-Q").  The May 2018 Form 10-Q again repeated the same Defamatory Statement that Dr. Fischkoff was terminated "for cause."

56.     On or about August 7, 2018, the Company filed with the SEC a Form 10-Q for the quarterly period ended June 30, 2018 (the "August 2018 Form 10-Q").  The August 2018 Form 10-Q repeated the same Defamatory Statement from the November 2017 Form 10-Q, March 2018 Form 10-K and May 2018 Form 10-Q (collectively, the "SEC Filings").

57.     In addition to Defendants' false statements concerning Plaintiff's termination, on or about June 23, 2017, the Company filed with the SEC a Schedule 14A (the "Schedule 14A"), in which Defendants stated that Dr. Fischkoff "did not achieve his individual [performance] goals."

58.     This claim is directly contradicted by the Company's Board of Directors, which has acknowledged in writing that Dr. Fischkoff met 50 percent of his goals.

59. In the SEC Filings and Schedule 14A, the Company intentionally and knowingly misrepresented the circumstances surrounding Dr. Fischkoff's termination and performance with the intent to cause him reputational and other harm.

## FIRST CLAIM

### (Breach of Contract against the Company)

60. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

61. The parties hereto entered into a valid and enforceable Employment Agreement, under which Plaintiff fully performed.

62. Notwithstanding Plaintiff's performance, the Company has failed to perform its obligations under the Employment Agreement and has not paid Plaintiff the compensation and equity owed as set forth in the Employment Agreement as a result of his termination.

63. Already Dr. Fischkoff has suffered substantial damages. Since Dr. Fischkoff's termination, a class action has been commenced against LBI for, *inter alia*, misrepresentations made to investors causing the Company's stock to decline, thus significantly impacting the value of Dr. Fischkoff's options.

## SECOND CLAIM

### (New York Labor Law as Against All Defendants)

64. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

65. Pursuant to the New York State Labor Law ("NYLL"), Defendants were Plaintiff's "employer" and Plaintiff was an "employee," as defined in Article 6, Section 190 et al.

66. Pursuant to Article 6, Section 190(1) of the NYLL, wages is defined to include all earnings.

67. Despite multiple demands, Defendants knowingly and willfully withheld Plaintiff's earned wages upon his termination when Defendants failed to pay Plaintiff his earned compensation, including without limitation, the remaining Retention Bonus and Incentive Bonus (collectively, the "Unpaid Wages") in violation of Article 6 of the NYLL, including, without limitation, an unlawful deduction in violation of NYLL § 193.

68. Pursuant to Article 6, Section 198(1-a) of the NYLL, Plaintiff is entitled to payment of the Unpaid Wages, reasonable attorney's fees, prejudgment interest, costs of the suit and liquidated damages equal to one hundred percent of the total amount of the wages due.

## THIRD CLAIM

### (Retaliation under NYLL Against the Company)

69. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

70. Plaintiff engaged in a protected activity when he commenced the Action to recover unpaid wages and other compensation in connection with the Employment Agreement and Retention Bonus.

71. But for the filing of the Action, Defendants would never have filed the Counterclaims or the Application, as evidenced by the temporal proximity of the filings and baseless Counterclaims as set forth in detail above.

72. As a result of the retaliatory animus, Plaintiff has suffered damage, including but not limited to, reputational harm, and is entitled to equitable and monetary relief including but

not limited to compensatory and other damages, reasonable attorneys' fees and costs, punitive damages, and other appropriate relief.

73. Notice of this claim has been served upon the Attorney General pursuant to NYLL § 215(2).

## FOURTH CLAIM

**(Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendants)**

74. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

75. The Retention Bonus entered into between Plaintiff and the Company contained implied covenants of good faith and fair dealing. These implied covenants obligated the Company to refrain from doing any act that would deprive Plaintiff of the benefits of the agreement or that would impede Plaintiff from performing any or all of the conditions of the agreement that he agreed to perform.

76. The Company's misconduct described herein breached the implied covenant of good faith and fair dealing in connection with the second half of the Retention Bonus.

77. Specifically, Defendants induced Plaintiff to stay with the Company with promises that he would be paid the Retention Bonus, then interfered with Plaintiff's right to receive the benefit by fabricating pretextual performance critiques, placing Plaintiff on a PIP, frustrating Plaintiff's ability to perform the obligations of his employment, and prematurely terminating Plaintiff solely to avoid paying him the second half of the promised Retention Bonus.

78. Plaintiff is now suffering and continues to suffer significant monetary damages as a result of the Company's breach of implied covenant of good faith and fair dealing.

## **FIFTH CLAIM**

### (Defamation)

79. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

80. Defendants falsely stated in multiple public filings that Plaintiff was terminated for cause as defined in the Employment Agreement.

81. Defendants further falsely stated that Plaintiff did not meet any of his goals, when in fact he had met 50 percent of his goals as acknowledged by the Company's Board of Directors.

82. Defendants made the defamatory statements with knowledge of, or reckless disregard as to, the falsity, and/or did so negligently or in a grossly negligent and wanton manner, without authorization or privilege.

83. The Defamatory Statements pertained to Plaintiff's professional stature and reputation and as such are actionable *per se*.

84. The Defamatory Statements were made with actual malice, entitling Plaintiff to punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

i. On the First Cause of Action in an amount to be determined in accordance with the Employment Agreement, together with prejudgment interest, costs, expenses and attorneys' fees;

ii. On the Second Cause of Action for Unpaid Wages, reasonable attorney's fees, prejudgment interest, costs of the suit and liquidated damages equal to one hundred percent of the total amount of the wages due;

iii. On the Third Cause of Action in an amount to be determined at trial, together with prejudgment interest, costs, expenses and attorneys' fees;

iv. On the Fourth Cause of Action in an amount to be determined at trial, together with prejudgment interest, costs, expenses and attorneys' fees;

v. On the Fifth Cause of Action in an amount to be determined at trial, together with costs, expenses and attorneys' fees;

vi. For the costs and disbursements of this action on all causes of action; and

vii. Such other and further relief as this Court deems just and proper.

Dated: October 29, 2018
      New York, New York

Respectfully submitted,

**MOSES & SINGER LLP**
*Attorneys for Plaintiff*

By:   /s/ Kimberly Klein\_\_\_\_
      Kimberly Klein (KK-6312)
      Daniel A. Hoffman (DH-0539)
      Megan Daneshrad (MD-3817)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174-1299
212-554-7800 (telephone)
212-554-7700 (facsimile)